ACCEPTED
03-14-00676-CR
6244416
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/27/2015 9:02:10 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00676-CR

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/28/2015 8:43:00 AM
JEFFREY D. KYLE
Clerk

# IN THE COURT OF APPEALS
# FOR THE
# THIRD SUPREME JUDICIAL DISTRICT
# AT AUSTIN, TEXAS

**ANGELITA RODRIGUEZ PACHECO,**
**Appellant**

**vs.**

**THE STATE OF TEXAS,**
**Appellee**

**Appeal from the 424th Judicial District Court**
**Cause No. 41988**
**Burnet County, Texas**
**The Honorable Dan Mills, Judge Presiding**

## APPELLANT'S BRIEF

**Gary E. Prust**
**State Bar No. 24056166**
**1607 Nueces Street**
**Austin, Texas  78701**
**(512) 469-0092**
**Fax:  (512) 469-9102**
**gary@prustlaw.com**

**ATTORNEY FOR APPELLANT**

# IDENTITY OF THE PARTIES

**APPELLANT:**
Angelita Rodriguez Pacheco
Hilltop Unit
1500 State School Road
Gatesville, TX 76598-2996

**TRIAL COUNSEL FOR APPELLANT:**

| | |
|---|---|
| Michael Watson | Michelle Moore |
| SBN 24060804 | SBN 00798294 |

Burnet County Public Defender's Office
1008 N. Water St.
Burnet, Texas 78611

**APPELLATE COUNSEL FOR APPELLANT:**
Gary E. Prust
SBN 24056166
Law Office of Gary E. Prust
1607 Nueces St.
Austin, TX 78701

**TRIAL COUNSEL FOR APPELLEE:**

| | |
|---|---|
| Blake Ewing | Richard Crowther |
| SBN 24076376 | SBN 05174200 |

Assistant District Attorneys
33rd and 424th Judicial District Attorney's Office
PO Box 725
Llano, TX 78643

**APPELLATE COUNSEL FOR APPELLEE:**

| | |
|---|---|
| Gary W. Bunyard | Blake Ewing |
| SBN 03353500 | SBN 24076376 |

Assistant District Attorney
33rd and 424th Judicial District Attorney's Office
PO Box 725
Llano, TX 78643

# TABLE OF CONTENTS

Identity of the Parties............................................................................................ii

Table of Contents..................................................................................................iii

Table of Authorities .............................................................................................. v

Statement of the Case............................................................................................ 1

Statement Regarding Oral Argument..................................................................... 1

Issues Presented .................................................................................................... 2

I.    Whether entering a hotel room at the direction of a supervisor or agent of the owner is sufficient evidence of lack of effective consent to sustain a conviction for burglary of a habitation.

II.    a.    Whether Appellant suffered egregious harm from the omission of the full definition from the Texas Penal Code of "effective consent", a vital defense theory, in the jury charge.

b.    Whether Appellant suffered egregious harm from the erroneous inclusion in the jury charge that entry is without effective consent if it is without asset in fact.

III.    Whether it is error to exclude evidence of a lack of felony convictions when the defense witness called to offer the evidence has significant knowledge of the defendant's life history but has not known the defendant her entire life.

IV.    Whether the defendant's constitutional right not to be compelled to testify is violated when evidence is erroneously excluded and the defendant is then impelled to testify to establish the same facts the excluded evidence would have shown.

Statement of the Facts............................................................................................ 8

Summary of the Argument......................................................................... 19

Argument

    I.   Whether entering a hotel room at the direction of a supervisor or agent of the owner is sufficient evidence of lack of effective consent to sustain a conviction for burglary of a habitation. ...................................... 23

    II.    a.    Whether Appellant suffered egregious harm from the omission of the full definition from the Texas Penal Code of "effective consent", a vital defense theory, in the jury charge.

        b.    Whether Appellant suffered egregious harm from the erroneous inclusion in the jury charge that entry is without effective consent if it is without asset in fact................................................................... 30

    III.   Whether it is error to exclude evidence of a lack of felony convictions when the defense witness called to offer the evidence has significant knowledge of the defendant's life history but has not known the defendant her entire life. ............................................... 39

    IV.   Whether the defendant's constitutional right not to be compelled to testify is violated when evidence is erroneously excluded and the defendant is then impelled to testify to establish the same facts the excluded evidence would have shown. ................................. 45

Prayer ...................................................................................................... 53

Certificate of Service .............................................................................. 55

Certificate of Compliance........................................................................ 55

Appendix.................................................................................................. 56

# TABLE OF AUTHORITIES

**CASES**

*Abdnor v. State*, 871 S.W.2d 726 (Tex. Crim. App. 1994)....................31, 32, 33, 38

*Alexander v. State*, 753 S.W.2d 390 (Tex. Crim. App. 1988) ................................31

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1984)........................30, 31, 38

*Birdsong v. State*, 82 S.W.3d 538 (Tex.App. -- Austin 2002, no pet.) .............46, 47

*Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010) ..............................23, 24

*Brumfield v. State*, 445 S.W.2d 732 (Tex. Crim. App. 1969)..........................45, 46

*Byrd v. State*, 336 S.W.3d 242 (Tex. Crim. App. 2011) ...........................................24

*Carroll v. State*,
     68 S.W.3d 250 (Tex.App. -- Fort Wort 2002, no pet.) (on remand) ............46

*Chapman v. State*, 115 S.W.3d 1 (Tex. Crim. App. 2003) .....................................45

*Espinoza v. State*, 955 S.W.2d 108 (Tex.App. -- Waco 1997, pet ref'd) ................32

*Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866 (1981)...........................................46

*Frazier v. State*, 760 S.W.2d 334 (Tex.App. – Texarkana 1988, pet. ref'd)...........23

*Freeman v. State*, 707 S.W.2d 597 (Tex. Crim. App. 1986) ..................................31

*Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008 (1968).............................47

*Holmes v. State*, 323 S.W.3d 163 (Tex. Crim. App. 2010)...............................39, 45

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1971).......................................25

*Johnson v. State*, 357 S.W.3d 653 (Tex. Crim. App. 2012) ...................................45

*Leday v. State*, 983 S.W.2d 713 (Tex. Crim. App. 1998) .......................................46

*Mallory v. Hogan*, 378 U.S. 1 (1964) ....................................................................46

*Mansfield v. State*, 306 S.W.3d 773 (Tex. Crim. App. 2010),..........................41, 42

*Minnesota v. Murphy*, 465 U.S. 420 (1984) ...........................................45

*Miranda v. Arizona*, 384 U.S. 436, 88 S.Ct. 1692 (1966) .......................................46

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) (en banc) ............39

*Morales v. State*, 416 S.W.2d 436 (Tex. Crim. App. 1967) ...................................49

*Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005) ..............................30, 37, 38

*Olley v. HVM, L.L.C.*,
    449 S.W.3d 572 (Tex.App. -- Houston [14th Dist.] 2014, pet. ref'd) ....24, 27

*Osbourn v. State*, 92 S.W.3d 531 (Tex. Crim. App. 2002)................................40, 41

*Potier v. State*, 68 S.W.3d 657 (Tex. Crim. App. 2002).......................................39

*Prescott v. State*, 610 S.W.2d 760 (Tex. Crim. App. 1981) ...................................25

*Roberson v. State*, 100 S.W.3d 36 (Tex.App. -- Waco 2002, pet. ref'd)...........39, 45

*Salas v. State*, 548 S.W.2d 52 (Tex. Crim. App. 1977) ........................................24

*Sherlock v. State*, 632 S.W.2d 604 (Tex. Crim. App. 1982).......................47, 48, 51

*Sweeten v. State*, 693 S.W.2d 454 (Tex. Crim. App. 1985).............................47, 49

*Thomas v. State*, 572 S.W.2d 507 (Tex. Crim. App. 1976) .............................47, 49

*Trevino v. State*, 577 S.W.2d 242 (Tex. Crim. App. 1979) ...................................41

*United States v. Wright*, 533 F.2d 214 (5th Cir. 1976) ...........................................46

*Walker v. State*,
    299 S.W. 417, 108 Tex.Crim. 190 (Tex. Crim. App. 1927).............42, 43, 44

*Willover v. State*, 70 S.W.3d 841 (Tex. Crim. App. 2002) .............................39, 40

*Winegarner v. State*, 235 S.W.3d 787 (Tex. Crim. App. 2007) ............................39

**STATUTES AND RULES**

Texas Code of Criminal Procedure art. 1.05 (West 2013).....................................45

Texas Code of Criminal Procedure art. 36.19 (West 2013)..................................31

Texas Code of Criminal Procedure art. 37.07 § 3(a)(1) (West 2013)...............48, 49

Texas Code of Criminal Procedure art. 44.12 § 4(e) (West 2013) .............40, 43, 48

Texas Health and Safety Code § 341.066(c) (West 2013).....................................36

Texas Health and Safety Code § 341.066(g) (West 2013) ....................................36

Texas Health and Safety Code § 341.066(h) (West 2013) ....................................36

Texas Penal Code § 1.07(35)(A) (West 2013)..................................................24, 31

Texas Penal Code § 1.07(11) (West 2013) ..................................23, 24, 31, 32, 33

Texas Penal Code § 1.07(19) (West 2013) ..................................24, 28, 30, 33, 34

Texas Penal Code § 30.01(1) (West 2013) ..........................................................23

Texas Penal Code § 30.02 (a)(3) (West 2013).................................................23, 32

Texas Rules of Appellate Procedure 44.2(a) (West 2013) ..............................39, 45

Texas Rules of Appellate Procedure 44.2(b) (West 2013) ...................................39

Texas Rules of Evidence 601.............................................................................20

Texas Rules of Evidence 602.........................................................................20, 40

Texas Rules of Evidence 701.....................................................................20, 40, 43

**CONSTITUTIONAL PROVISIONS**

TEXAS CONST. art. I § 10..................................................................................13

UNITED STATES CONST. amend. V .......................................................................13

**OTHER AUTHORITY**

Black's Law Dictionary (2nd Pocket Ed. 2002)................................................ 24, 25

## STATEMENT OF THE CASE

*Nature of the case:* This is an appeal from a criminal conviction for two counts of burglary of a habitation, in violation of § 30.02(c)(3), Texas Penal Code.

*Course of the proceedings:* The offenses were alleged to have been committed July 31, 2013. CR 4-5. The indictment was returned October 8, 2013. CR 4. There were no evidentiary pretrial matters. *See* CR *passim*. A two-day jury trial began September 15, 2014. *See* II-IV RR *passim*. The same jury also heard the punishment case and returned a verdict of 18 years confinement and a $5000 fine on each count. V RR 135-36.

*Trial court's disposition:* The trial court imposed sentence in compliance with the verdict of the jury. V RR 138.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. Appellant submits the issues in this case are complex and unique. Accordingly, Appellant believes the Court will be aided by oral argument of the parties to help guide the Court's decision.

## ISSUES PRESENTED

### I.

Whether entering a hotel room at the direction of a supervisor or agent of the owner is sufficient evidence of lack of effective consent to sustain a conviction for burglary of a habitation.

### II.

a.      Whether Appellant suffered egregious harm from the omission of the full definition from the Texas Penal Code of "effective consent", a vital defense theory, in the jury charge.

b.      Whether Appellant suffered egregious harm from the erroneous inclusion in the jury charge that entry is without effective consent if it is without asset in fact.

### III.

Whether it is error to exclude evidence of a lack of felony convictions when the defense witness called to offer the evidence has significant knowledge of the defendant's life history but has not known the defendant her entire life.

### IV.

Whether the defendant's constitutional right not to be compelled to testify is violated when evidence is erroneously excluded and the defendant is then impelled to testify to establish the same facts the excluded evidence would have shown.

## STATEMENT OF FACTS

Melina Escobar worked at the Hill County Inn in 2013 as a housekeeper. III RR 37. She was there for two or three months when Appellant began working there is a similar capacity. III RR 38. But Ms. Escobar quit shortly after the allegations against Appellant arose because she did not want any responsibility for the theft. III RR 51. Part of Ms. Escobar's duties included training Appellant to clean rooms. III RR 38-39. It was also common for some of the housekeeping crew to live at the hotel, and part of their pay went toward rent. III RR 39-40. Appellant lived in one room with her boyfriend. III RR 40. Appellant did not have a master key to all the rooms, but Ms. Escobar did. III RR 40. When she would find property outside a room, she would place a sticky note with the number of a room near the location the item was found and turn it in to the front desk. III RR 42. Each day Ms. Escobar is provided with a list from the front desk of which rooms they are to clean. III RR 52. When a guest does not want their room cleaned, they would put a magnet on the outside of the room advising staff not to disturb the room. III RR 52. Each room has a magnet. III RR 52.

Ms. Escobar stayed with Appellant those first two days of her training, and they cleaned rooms together. III RR 40-41. On the third day, Ms. Escobar did not work with her and noticed Appellant went back to her own room between cleaning guest rooms. III RR 40. Despite this, Ms. Escobar did not see Appellant at all

8

times, yet she concluded Appellant could stolen some items from the rooms. III RR 42. The two cleaned somewhere between 12 to 16 rooms, mostly light cleaning. III RR 51. At no time could Appellant have entered a room without Ms. Escobar knowing because she was the only one with the master key. III RR 53. Ms. Escobar devised a plan where she would clean one room and Appellant would clean the next so they could finish quicker. III RR 54. Nonetheless, she would still check each room Appellant cleaned and would clean the restrooms in each of those rooms. III RR 61.

Also on that particular day after work, Appellant asked Ms. Escobar for a ride to a gas station in a nearby town. III RR 44. Ms. Escobar noticed Appellant had an LG brand phone with AT&T service that was a touch screen which was colored green. III RR 46.

Later that evening, after Ms. Escobar says she left Appellant and her husband, the front desk clerk of the hotel called Ms. Escobar to ask if she stole a cell phone. III RR 47. She was provided a picture of the phone, and she said it matched the one she saw Appellant in possession of earlier. III RR 48. Ms. Escobar did not return to the hotel nor go to the police station that evening; III RR 55; but instead later went to the police station to provide a written statement. III RR 55-56.

Frank Alderete stayed at the Hill Country in during July 2013. III RR 22. He would often leave personal items, clothing, a laptop computer, and a cellular

9

telephone in the room because his job did not allow any communication devices on site. III RR 23. Upon returning from work on July 31, 2013, he went to check his cell phone in the nightstand to see if he had any missed calls. III RR 24. He discovered the phone was missing. III RR 24. His phone was an LG phone with AT&T service, with a touch screen that was colored green. III RR 23-24. He also testified no one asked if he wanted his room cleaned, but if they had asked, he would have declined. III RR 27-28. He never told the hotel he did not want his room cleaned. III RR 31. Had his room had a door hanger requesting that no one enter, he would have used it. II RR 28. And he certainly would not have given consent to any person or to any member of the housekeeping crew of the hotel had he known someone would take his cell phone. III RR 29. He also noted the only fresh, clean towels he received were those he got on his own. III RR 31. His phone never was located. III RR 34.

David Amidon has worked with the Marble Falls Police Department since 2011. III RR 63. He responded to a call at the Hill Country Inn on July 31, 2013, and met Ms. Vicki Fitzpatrick who reported property was stolen from one of the hotel rooms. III RR 63. He spoke with the Appellant after he learned she was on the housekeeping crew, and she denied stealing a cell phone and that she did know anything about the location of the stolen cellular phone. II RR 67.

At that time, another individual came in and reported an iPad was stolen. III

10

RR 68. Upon hearing that report, Officer Amidon asked Appellant if she had the iPad to which she admitted. III RR 68. She took Amidon to her room and retrieved the iPad from between the mattress and box spring of the bed. III RR 70. She said she placed it there for safekeeping. III RR 72. Appellant told the officer she found the item in front of room 228 on the ground. III RR 72. After being asked, Appellant granted Officer Amidon consent to search her room, and he found no other stolen property. III RR 72. There were a laptop and a few other phones; II RR 72; none of which were reported stolen. III RR 73.

Luis Arguello worked in the area during in July 2013 and stayed at the Hill Country Inn. IV RR 12. He left with his crew each day at 6:30 am and they would all return at 5:00 pm. IV RR 14. His nephew was the only other person with a key to the room. IV RR 15. On July 31, 2013, Mr. Arguello left his iPad charging in the corner of the room on top of a chair. IV RR 15. When he left that morning, the device had cracks on the screen. IV RR 16. After they returned from work, one coworker told Mr. Arguello his phone was missing so Mr. Arguello went to his room and discovered his iPad was gone. IV RR 17. Mr. Arguello went to the front desk to report it and saw two officers talking with Appellant. IV RR 17.

Appellant reported she found it outside the hotel room door. IV RR 17. She told Mr. Arguello she put it in a corner room with another guy. IV RR 18. She did not, however, say she did not have it. IV RR 23. He went to the other room and the

gentleman said he did not have it. IV RR 18. After that, Mr. Arguello heard she reported to the police she had the device. IV RR 18. Upon its return, Mr. Arguello noted it was no more damaged than when he left it that morning. IV RR 19.

He never gave express consent for anyone to enter his room. IV RR 20. He never gave consent for anyone else to use his iPad and would not have consented to anyone cleaning the room if he had known an item would be stolen. IV RR 20-21. He never told the front desk not to send in housekeeping and did not place the magnet advising housekeeping not to enter the room. IV RR 21.

Appellant's husband, Raul Munoz testified they have been together four-and-one-half years. IV RR 26. In July 2013, she owned an LG brand Verizon touch-screen smart phone. IV RR 27. She received the telephone from a friend of hers named Benjamin Tarbet who owned multiple phones, electronic devices, and computers. IV RR 27-28. At the end of the shift, Ms. Escobar brought Mr. Munoz and Appellant to a Dairy Queen restaurant and also drove them back to the Hill Country Inn. IV RR 31-32. After they returned, Appellant was walking when he noticed a tablet on the ground. IV RR 32. He suggested Appellant pick it up, and they would go turn it in to the front desk afterward. IV RR 32; 31.

He went to the convenience store and returned, a total of about fifteen minutes time. IV RR 32. When he returned, the police were present and would not let anyone leave the premises. IV RR 33. In their room, Mr. Munoz and Appellant

had a laptop and some telephones. IV RR 33-34. Appellant received the computer from her friend, Mr. Tarbet, as well. IV RR 34.

On cross-examination, the state impeached Mr. Munoz with a previous conviction for felony burglary of a habitation and elicited that has a lengthy criminal history. IV RR 35-36.

The jury charge was drafted without objection and listed the lesser-included offenses of misdemeanor theft on each burglary count, and the jury returned a verdict of guilty of burglary on each count. IV RR 44; 73-74.

At punishment, there were preliminary discussions about what the state intended to introduce. V RR *passim*. Namely, they intended to use an unauthorized use of a motor vehicle offense, two previous misdemeanor theft offenses, a previous deferred adjudication for credit card abuse, and a new offense for a control substance transaction, of which Appellant was notified very shortly before trial commenced. V RR 6-7. The state turned over offense reports and a video of the alleged transaction. V RR 7-8. In discussing the new controlled substance offense, the state conceded they had not yet received results from the lab showing a positive test for a control substance. V RR 10. In discussing the requirement that an extraneous offense introduced in punishment be proved beyond a reasonable doubt, the following exchange occurred:

> The Court: Well, [Appellant's] right that it has to be shown beyond a reasonable doubt, so, you know, I don't know. If there's

13

nothing there I don't know how we let that in, Mr. Crowther.

Mr. Cowther: If that's what the Court wishes.

The Court: It's not what I wish.

Mr. Crowther: Well, right.

The Court: It's just what the rules suggest. I didn't write that rule. And, I mean, if it would be up to me I might just let the jury decide and let the people argue what they think is going on. Under 37.07 [of the Texas Code of Criminal Procedure] I've got a lot of discretion, but it does say they have to find beyond a reasonable doubt.

…

The Court: So you want to – you want to withdraw that particular transaction?

Mr. Crowther: Yeah, to protect my record I think I will.

…

The Court: .. I think it's fair game to ask the question, though, were you engaged in a drug transaction with this – whoever it is.

…

The Court: So I will warn you the rule will change. If she elects to testify it becomes fair game to ask that question.

V RR 10-12.

The state went on in punishment to introduce evidence by Maxine Watts. V RR 15. She met Appellant through her granddaughter in 2012 and agreed to let Appellant borrow a truck to move. V RR 17. Ms. Watts provided testimony that

14

Appellant's failure to return the truck caused her and her husband to buy another vehicle and had a negative effect on her husband's health. V RR 18-21.

The state also introduced evidence of a prior deferred adjudication probation for credit card abuse and several misdemeanor offenses, adjudicated and unadjudicated through the District Attorney Investigator, Ms. Blindert. V RR 22-35.

In Appellant's punishment case, Ms. Mary Thirston testified Appellant lived with Ms. Thirston's son and that she knows Appellant well. V RR 37. She stated Appellant and Mr. Munoz used a truck to help Ms. Thirston's daughter move from San Antonio, but they did not use the borrowed truck to do so. V RR 40. The borrowed truck was parked at Ms. Thirston's house in the same county as the owner of the vehicle. V RR 40. She also felt Appellant is a good person, would do well on probation, and did not need to go to prison. V RR 40-45.

Mr. Munoz was again called to testify, this time for punishment. He said he would help her if the jury granted probation, make sure she gets what she needs, and where she needs to go. V RR 51. Ms. Jeanette Murray, a community supervision officer for the judicial district, was called to testify about the basic conditions of probation. V RR 56-62.

Following this, Appellant's trial counsel explained to her all the advantages and disadvantages of testifying. V RR 63-64. Based on that, she elected not to

testify. V RR 64. The state then submitted there was no evidence in the record Appellant was never convicted of a felony. V RR 64. To meet the challenge, Appellant offered Raul Munoz. V RR 64. The state objected that his knowledge for lack of felony convictions is hearsay and requested a voir dire of the witness outside the presence of the jury. V RR 65-66.

Mr. Raul Munoz had been with Appellant for five years, described them as being married, never knew her to have any felony convictions, and has gotten to know her and her history well. V RR 67. He also has a broad knowledge for her entire life and knows her not to have been convicted of any felony offenses. V RR 67. The state again objected Mr. Munoz had no personal knowledge after it elicited that he has no personal knowledge of her criminal history apart from the five years he had been with Appellant. V RR 68.

One redirect, Mr. Munoz testified he and Appellant completed applications for apartments and they have never been denied because of felony convictions for Appellant. V RR 69. Additionally, she worked jobs and those jobs would not let her work with felony convictions. V RR 70. Mr. Munoz also feels like he has a competent knowledge of Appellant's entire life and based on that knowledge he believed she had never been convicted of a felony. V RR 70.

The trial court sustained the state's objection, citing *Mansfield v. State*, 306 S.W.3d 773 (Tex. Crim. App. 2010), as authority for the proposition that a father's

testimony his son had never been conviction of a felony established probation eligibility. V RR 71-72. The trial court reasoned that a father has lifelong knowledge of a child, and Mr. Munoz only had a five-year knowledge of Appellant. V RR 72. The trial court then found the witness incompetent to provide the opinion that Appellant had no felony convictions because of that lack of personal knowledge. V RR 73-74; 75-76. Appellant argued his testimony should go to the weight of the evidence and not the admissibility. V RR 74. The trial court sustained the state's hearsay objection and further found, "there's no competent evidence on the basis that Mr. Munoz's testimony … is that he's only known the defendant for five years." V RR 76-77.

After this ruling, Appellant felt compelled to testify and said she did so solely based on the trial court's ruling Mr. Munoz incompetent to testify. V RR 77. She related her educational and work experience, family history, and criminal problems, ultimately asking the jury for probation. V RR 77-101. On cross-examination, the state vigorously questioned her about her probation history and concluded by asking about an unindicted extraneous offense of delivery of a controlled substance. V RR 102-116. During a break in Appellant's testimony, outside the presence of the jury, the trial court iterated into the record:

> "The Court wants to put on the record the defense reluctantly, as they suggest, called their client to testify. We've been listening to testimony for maybe an hour possibly and the reason they were going to call the defendant was to prove up her eligibility for probation. The

17

defense went into all sorts of other matters about her eligibility for probation, she'd be a good candidate for probation. They far exceeded what their original purpose was. And, for the record, the Court wants the record to reflect that the defense had the opportunity to ask the prosecution's witness, Mrs. Blindert, an investigator, the question whether she was aware of the fact that the defendant had previously been convicted of a felony because she's someone who searches criminal history records, and during their cross examination they failed to do so. There is also a peace officer in this courtroom that has dealt with this defendant. They could have called that individual as a witness to ask that question. The defense also has their investigator in this courtroom, one of their staff members, both of whom they could have called, in the Court's opinion, to testify and try to elicit testimony as to the fact that the defendant as never previously convicted of a felony. They elected not to do so for whatever reason."

V RR 117-18. She admitted to delivering methamphetamine to another person on July 3, 2014 at a hotel. V RR 118-19. Following argument and the court's charge, the jury reached a punishment verdict of 18 years' confinement and a $5000 fine on each count. V RR 138. This appeal follows.

18

## SUMMARY OF THE ARGUMENT

### I.

The evidence cannot sustain the convictions for burglary of a habitation even when viewed in light most favorable to the verdict. First, Appellant had effective consent of an owner to enter two habitations at issue, hotel rooms. By virtue of her employment and at the direction of her ostensible supervisor, an owner for purposes the burglary statute, Appellant entered the rooms. Thus, element of lack of effective consent is conspicuously absent. Second, Appellant entered the rooms at the direction of an owner, Mr. Escobar, who had a greater right of possession of the premises than the occupants. Finally, there is no affirmative evidence Appellant induced Ms. Escobar's effective consent by fraud. In fact, the evidence shows Appellant's presence in the rooms was at the idea and suggestion of Ms. Escobar. In the case at bar, a burglary of a habitation conviction cannot be sustained when an employee of the hotel is directed to enter rooms by her supervisor, because consent was granted.

### II.

Two closely related issues regarding the definitions of "consent" and "effective consent" are addressed in this issue. The first point argues Appellant suffered egregious harm from the exclusion of the full definition provided in the penal code for "effective consent" in the jury charge. The second point argues

Appellant suffered egregious harm by the inclusion of an instruction that consent is not effective if the actor did not have assent in fact from the owner.

The effective consent for Appellant to be in the hotel rooms was a vital defense theory. She was an employee of the hotel, was directed by her supervisor who possessed the key to all rooms, to enter and clean them, and thus, was directed by a person who is an owner under the burglary statute to enter a habitation. Much of the voir dire and closing argument focused on the element of consent, which further highlights the weight of the element. Because Appellant did not request the full definition of "effective consent" nor object to the inclusion of the extra-statutory language included at the charge conference, the error is subject to the *Almanza* egregious harm analysis. The cause should be reversed and remanded, as each individual error, the cumulative weight of both, caused egregious harm to Appellant's right to a fair and impartial trial as it went the crux of a defense theory in the case.

### III.

This issue is similar to issue number four, the testimony of a witness was erroneously excluded under Rules of Evidence 601, 602, and 701. This exclusion is non-Constitutional error which lead to the Constitutional error addressed in issue number four, below. During the punishment phase, Appellant's husband testified in a state requested voir dire that Appellant never had been convicted of a felony. The

20

court sustained the state's objection to hearsay and also found the witness incompetent because he did not know Appellant her entire life. The evidence was erroneously excluded because the witness offered testimony on which he had personal knowledge and from which he could make reasonable inferences from the facts known to him. The excluded evidence lead directly to Appellant's being impelled to testify to establish her eligibility for community supervision, the introduction of an extraneous offense the state would otherwise not have been able to introduce, and a punishment verdict near the top of the range. The erroneous exclusion of the testimony caused Appellant egregious harm because it substantially affected Appellant's right to a fair and impartial trial.

## IV.

Appellant was impelled to testify to establish her eligibility for probation from the jury because the erroneous exclusion of a witness offered to do just that. The trial court ruled before the close of defense evidence on punishment, it would deny a requested jury instruction on community supervision because no evidence was introduced to establish Appellant never had been convicted of a felony. On a state requested voir dire of the proposed witness, Appellant's husband testified he had known her for five years and knew her history in great detail. From this he could have made a reasonable inference to offer lay opinion she never had been convicted of a felony. The court sustained the state's objection to hearsay and also

21

ruled the witness was incompetent to testify to the jury that Appellant was eligible for probation because he had not know Appellant her entire life.

As a direct result of the erroneous ruling, Appellant was impelled to testify, and she would not have chosen to do so had her husband been permitted to testify. At the end of her testimony, the state introduced an extraneous offense of delivery of a controlled substance into evidence, of which Appellant was notified shortly before trial and provided discovery for on the day of punishment. This extraneous offense likely had great influence on the punishment verdict of the jury. The taint from the erroneous exclusion also taints whether she intelligently, knowingly, and voluntarily waived her right not to testify. Accordingly, the important Constitutional right was violated and cannot be said to have not affected the punishment verdict. We the matter be remanded for a new trial on punishment.

**Argument**

**Issue I.**

**Whether entering a hotel room at the direction of a supervisor or agent of the owner is sufficient evidence of lack of effective consent to sustain a conviction for burglary of a habitation.**

**Standard of Review**

When an appellant challenges the sufficiency of the evidence supporting her convictions, the reviewing court will examine all the evidence adduced at trial in the light most favorable to the verdict and ask whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

**Law Applicable**

A person commits burglary of a habitation if, without the effective consent of an owner, she enters a habitation and commits or attempts to commit theft. TEX. PEN. CODE § 30.02(a)(3) (West 2013).

Habitation includes not just houses, but any structure adapted for overnight accommodation. TEX. PEN. CODE § 30.01(1) (West 2013). This includes motel and hotel rooms. *Frazier v. State*, 760 S.W.2d 334, 336 (Tex.App. – Texarkana 1988, pet. ref'd).

Consent is defined by the penal code as "assent in fact, whether express or

23

apparent." TEX. PEN. CODE § 1.07(11) (West 2013). "'Effective consent' includes consent by a person legally authorized to act for the owner...." TEX. PEN. CODE § 1.07(19) (West 2013). Consent is not effective when it is, *inter alia*, induced by threat or fraud; provided by a person known not to have authority to act for the owner; or only given to detect the commission of an offense. TEX. PEN. CODE § 1.07(19) (West 2013).

An owner means a person who (1) has title to the property, (2) possession of the property, whether lawful or not, or (3) a greater right to possession of the property than the actor. TEX. PEN. CODE § 1.07(35)(A) (West 2013). Possession is defined as "actual care, custody, control, or management." TEX. PEN. CODE § 1.07(39) (West 2013).

The manager of a business may be properly named as a person with ownership of a habitation. *Salas v. State*, 548 S.W.2d 52, 54 (Tex. Crim. App. 1977); *see also Byrd v. State*, 336 S.W.3d 242 (Tex. Crim. App. 2011) (It is proper and often better practice to allege the name of the corporation as the owner in a theft allegation). Likewise, the renter of the room may be an owner for purposes of the burglary statute. *Salas*, 336 S.W.2d at 54. A hotel guest is a mere licensee, not a tenant, and therefore is not vested with any estate in the property. *Olley v. HVM, L.L.C.* , 449 S.W.3d 572, 575 (Tex.App—Houston [14th Dist.] 2014, pet. ref'd). Black's Law Dictionary provides, in pertinent part, that a licensee is "one who has

permission to enter or use another's premises but only for one's own purposes and not for the occupier's benefit." BLACK'S LAW DICTIONARY, 419 (2nd pocket ed. 2001).

Lack of consent in a prosecution for burglary may be proved by circumstantial evidence. *Prescott v. State*, 610 S.W.2d 760, 763 (Tex. Crim. App. 1981). No "magic words" are necessary to prove effective consent is given to a defendant. *Id*.

Evidence will be found insufficient to sustain a conviction when the record contains "no evidence, or merely a 'modicum' of evidence, probative of an element of those offense." *Brooks*, *supra*. (citing *Jackson v. Virginia*, 443 U.S. 307, 319 ("[A] 'modicum' of evidence [cannot] by itself rationally support a conviction beyond a reasonable doubt.")

A criminal defendant turned appellant is permitted to raise an issue on appeal that a verdict is against the great weight of the evidence, as a constitutional due process complaint. *See Jackson*, 443 U.S. at 319; UNITED STATES CONST. Amend. XIV. The Texas Court of Criminal Appeals has now held that standard to determine whether the evidence is sufficient to sustain a conviction as "[c]onsidering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319.

**Analysis**

It is well established Appellant was an employee of the hotel and was being trained by Ms. Melina Escobar, an ostensible supervisor at the time of the offense. Ms. Escobar took responsibility for obtaining the list of rooms to clean from the front desk each day and, perhaps most importantly, was entrusted with the master key of the hotel. This key opens all doors to all guest rooms of the hotel. She was there some months longer than Appellant and seemed to know a good deal about the operations of the hotel including how many employees worked there, that the other members of the cleaning crew lived there, and what their payment arrangements were. Taken together, this demonstrates Ms. Escobar is an owner for purposes of the burglary statute. That is to say, she had actual care, custody, control, or management of the rooms and was entrusted by her employer.

It may also be concluded from the testimony either title owner to the Hill Country Inn or the title owner's representative provided the master key to Ms. Escobar and not to any other member of the housekeeping team. The title owner to the hotel property authorized Ms. Escobar to act on her behalf by bestowing upon Ms. Escobar a great deal of trust and responsibility. The title owner of the property has the ultimate possessory right to it. Ms. Escobar's right to possession is greater than that of other owners for penal code purposes, especially that of licensees.

On July 31, 2013, Ms. Escobar directly instructed Appellant what rooms she

26

was to enter. The evidence is undisputed the Ms. Escobar showed Appellant to and unlocked the door of each room before Appellant could enter. Appellant had no other way to enter any room without Mr. Escobar's permission and on top of that, only entered them at her direction. Following this, Ms. Escobar checked Appellant's work following each room she worked on and cleaned the restroom in each room to which Appellant was assigned. They would go through the same routine at the next room. It is clear that Appellant had permission and direction to enter each room.

Ms. Escobar's right to the property was greater than that of the alleged owners named in the indictment. As illustrated previously, Ms. Escobar has both a possessory right to the property for purposes of the burglary statute and was authorized to act for the owner, which can be concluded based upon the responsibilities entrusted to her. The occupant of a hotel room is a licensee. *Olley*, 449 S.W.3d at 575. As such, they were each with an inferior right to possession of the hotel room than that of title owner and by extension, another person authorized to act on the title owner's behalf, such as a manager.

Appellant acted with the effective consent of the person with a greater right to possession of the property than those individuals named in the indictment. Because she entered each room at the direction of an agent of the owner, she cannot be said to have entered without effective consent. Without the evidence of

27

the lack of effective consent, the state's case must fail. And quite contrary to a lack of evidence, Ms. Escobar provides affirmative evidence Appellant consent from an owner to enter the rooms.

Finally, it is expected the state will argue, as they did in trial, Appellant induced any consent to enter the rooms by fraud, thus rendering any consent not effective. *See* TEX. PEN. CODE § 1.07(19) (West 2013). The record does not demonstrate any affirmative evidence that Appellant induced Ms. Escobar into giving her consent to enter by way of fraud. Rather, the evidence demonstrates the contrary notion: Ms. Melina Escobar bore the idea that the duo split up and work on different rooms. It does not show Appellant persuaded or influenced Ms. Escobar into granting her consent to enter the rooms alone. Accordingly, Ms. Escobar's consent for Appellant to enter the rooms was effective and not rendered invalid because of fraud.

Ms. Escobar can be an owner under these facts under either of two theories: (1) by virtue of her employment and responsibilities or (2) as person authorized to act on behalf of the owner. Ms. Escobar had a greater right to possession than did the owners named in each count of the indictment. Her direction to Appellant to enter the rooms was therefore greater than any retrospective lack of consent by the named owners in the indictment. There is no evidence Appellant defrauded her way into entering the rooms on July 31. The opposite, however, is in evidence: Ms.

Escobar proposed the duo work on separate rooms and affirmatively granted Appellant entrance to each room.

The evidence is insufficient because the essential element that Appellant was without the effective consent of an owner when she entered either room is wholly wanting. Appellant respectfully requests this honorable Court grant the relief requested in this appeal and find the evidence is insufficient to support the verdict.

**Issue II.**

**a.** **Whether Appellant suffered egregious harm from the omission of the full definition from the Texas Penal Code of "effective consent", a vital defense theory, in the jury charge.**

**b.** **Whether Appellant suffered egregious harm from the erroneous inclusion in the jury charge that entry is without effective consent if it is without asset in fact.**

**Standard of Review**

In reviewing charge error the reviewing court will consider two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). In conducting review, the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, included the contested matters and the strength of the probative evidence, argument of counsel, and any other relevant information shown in the record of the trial as a whole. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

**Law Applicable**

Effective consent is defined in the penal code as including "consent by a person legally authorized to act for the owner." TEX. PEN. CODE. § 1.07(19).

Consent is defined as assent in fact, whether express or apparent. TEX. PEN. CODE § 1.07(11).

The owner is a person who has title to the property, possession of it, whether lawful or not, or a greater right to possession than the actor. TEX. PEN. CODE § 1.07(35)(A).

The Legislature defined "owner" very expansively to give anyone with a conceivable connection to the property ownership status. *Freeman v. State*, 707 S.W.2d 597, 603 (Tex. Crim. App. 1986). Under the penal code, any person who has a greater right to the actual care, custody, control, or management of the property is an "owner." *Alexander v. State*, 753 S.W.2d 390, 392 (Tex. Crim. App. 1988).

Unobjected to error in the court's instructions to the jury mandates reversal when the error is so egregious and created such harm that the accused "has not had a fair and impartial trial." *Almanza v. State*, 686 S.W.2d 157, 171-72 (Tex. Crim. App. 1985); TEX. CODE CRIM. PROC. art 36.19 (West 2013). Errors resulting in egregious harm include those that affect the very basis of the case, take from the defendant a valuable right, or vitally affect a defensive theory. *Almanza v. State*, 686 S.W.2d at 171-72.

An incomplete or erroneous jury charge jeopardizes the accused's

fundamental right to a jury trial because the jury is not properly guided in its fact-finding function by the jury charge. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).

**Analysis**

The jury charge erroneously excludes a definition provided in the penal code vital to the defense theory of the case and also includes a legal conclusion not established in the law. The two errors are closely related and for the sake of economy, will be addressed in one issue of this brief.

The jury charge, in pertinent part, reads "'**Consent**' means assent in fact, whether express or apparent. Entry is without the owner's effective consent if it is without the owner's assent in fact. Consent is not effective if induced by fraud." CR 28.

As the voir dire and the closing arguments each show, consent and effective consent were central to the prosecution and defense theories of the case. *See* II RR 44-49; 76-93; *see also* IV RR 56; 59-61; 63-64; 71.[1] The jury charge correctly defines "consent". CR 28; Tex. Pen. Code § 1.07(11) (West 2013). The charge,

_____

[1] The state and the trial court each tell the jury during the defense voir dire that a person must have consent to enter and for anything done inside the entered habitation. II RR 93. The burglary statute clearly states an offense is committed when the entry is without effective consent but says nothing to the effect that any activities within the habitation must also be with consent. *See* Tex. Pen. Code § 30.02(a) (West 2013); *see also Espinoza v. State*, 955 S.W.2d 108, 111 (Tex.App. – Waco 1997, pet. ref'd). Nonetheless, no reasonable person would likely grant consent for another to commit theft from that person's habitation.

32

however, does not include the language provided in the penal code to define "effective consent". CR 28; TEX. PEN. CODE § 1.07(19) (West 2013). As this was central to the defensive theory of the case, it should have been included in order to properly guide the jury in its fact-finding mission. *See Abdnor*, 871 S.W.2d at 392.

Second, the jury charge provides an instruction that "[e]ntry is without the owner's effective consent when it is without the owner's assent in fact." CR 28. This language attempts to mesh the definition of consent with that of what is excluded by definition from effective consent. *See* TEX. PEN. CODE § 1.07(11) and (19) (West 2013). By instructing the jury that an absence of "assent in fact" renders any entry illegal invades the province of the jury and instructs them to find an essential element of the offense.

It is also a misstatement of the law. The included sentence eliminates the possibility of what "effective consent" are defined as. Those activities which exclude consent from being "effective consent" is specifically listed in the Texas Penal Code § 1.07(19), and it does not include any language regarding "assent in fact." It wholly forgoes the needed instruction on consent from a representative or manager for the owner or some other person with a greater right to possession of the property so as to be effective. One might have effective consent when a person legally authorized to act for the owner grants permission for entry or to take an item—in the case of theft allegation. The jury is to determine whether there is

33

effective consent, as defined in the penal code. TEX. PEN. CODE § 1.07(19) (West 2013). That is a plainly erroneous statement and its inclusion strikes at the crux of the defensive theory in this case.

Having established error, Appellant concedes the error was not objected to at the charge conference. Because of this, Appellant must show the error caused egregious harm. As discussed above, consent and effective consent were the key issues in voir dire and during closing argument. Each party was aware it would form the defensive theory, and the state wisely anticipated it. Erroneous statements about the law were made on a state objection during Appellant's voir dire. II RR 87-90. Further the trial court went on to speak about the "scope of consent" and whether consent remains effective. II RR 90. Further, the jury was erroneously told, in effect, consent is only effective if a person does the one activity they are permitted to once granted permission to enter. II RR 90. Later, the trial court told the venire:

> ".. Members of the Jury, persons can have consent to do some things. I don't remember which juror it was that talked about you could exceed the scope of consent. The consent was to go use the restroom in the first hypothetical. The consent wasn't effect [sic] as to going into the house and stealing something, so there was a limited consent given. And depending on the facts of this case, what you find from the circumstances that you have not hear yet, that's what you're going to have to decide, whether there was a consent given to do something or whether a person is, you know, having – had some idea they were going to commit theft, and, thus, the limited consent given to enter, if that's what the facts are, maybe wasn't effective for that particular

34

purpose."

II RR 91-92. Ensuing was a conversation among the trial court, defense counsel, and the state, all in the presence of the venire, discussing how the case is charged and whether consent is effective. II RR 92. But the state interjected and told the court, in front of the venire, "[Those accused] have to have effective consent for the entry and what they do on the inside." II RR 93. The trial court responded,

> "Okay. That's exactly what we're saying. That's exactly what we're saying. They entered and then the intent has to be something other than just the entry. At the time they're entering they have the intent to do something that exceeds the scope of the consent that was give. And that's all we're saying, Members of the Jury. That sounds like it's parsing words, but that's what you're going to have to decide when you hear the case. Splitting hairs, how many angels can dance on the head of a pen [sic], Mr. Watson. Is that a good illustration?"

II RR 93. This is an incorrect statement of the law on which the state and the trial court agreed, defense counsel did not object, and the trial court represented was the law to the venire. *See Espinoza*, 955 S.W.2d at 111. Following this, multiple members of the venire told the court and defense counsel that hearing the whole exchange among the trial court and the attorneys that they had already made up their mind, despite the presumption of innocence. II RR 93-99.

During, the closing arguments of the state and Appellant each focused to a large extent on effective consent. The state argued,

"She went into those rooms without the effective consent of the owners. Now, the defense mentioned something earlier in the course of this trial about, well, her coworker gave her consent she put in the key card in the door, right, so she had consent to go in. That's not going to work. You have to get effective consent of the owner, of the owner of the room. Look at the definitions of an owner. Someone with title to the property, possession of the property, or a greater right to be there than the defendant. Melina Escobar, the defendant's coworker who she used top get her in those rooms, could not give consent for the owner if the owner didn't want to give it. Okay? So she can't point at her coworker and say, oop, I'm off the hook because my coworker let me in the room. That's not going to work. She had to have the effective consent of the owners.

"And, no, maybe, maybe some of you will say, well, but, you know, a housekeeper, they generally are allowed to go in there. Okay. But they are generally allow to go into rooms why? To clean rooms. Melina Escobar – maybe if you think they didn't giver her consent to go in either, but she had their effective consent because she was going in to clean a room and that's what she did. She – the defendant can't make up. She wasn't going in to clean rooms. She was going in to steal things. …"

IV RR 59-60.

In their rebuttal closing, the state hearkened back to the voir dire exchange about the "scope of consent". IV RR 70. The state also conceded hotels have housekeepers that are given indirect permission to come in and take sheets and towels,[2] and to clean up your mess, not to take your stuff. IV RR 70. The defense theory in closing argument what that Appellant should be charged with theft; she is

---

[2] Hotel operators are required by law to maintain sanitary conditions, thoroughly clean each room, and to provide clean and sanitary sheets, towels, and pillowcases. Additionally, the facility as a whole must be maintained in sanitary conditions. Tex. Health and Safety Code § 341.066 (c), (g), and (h) (West 2013).

not guilty of theft, but that is the appropriate charge. IV RR 63. Counsel described the managerial capacity of Ms. Escobar and continued to argue that apparent consent was obvious from the evidence. IV RR 63.

Similar to this case is *Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005). There, the state told the jury in voir dire they jury could convict if they found any of the three alleged methods in which the credit card abuse statute was violated, i.e., by stealing a card, by receiving a card stolen, or by using the card. *Ngo*, 175 S.W.3d at 750. The trial court, during defense voir dire, told the jury the state must prove one such act, but that the jury need not unanimously agree on which act. *Id*. at 751. Further, Ngo testified at trial denying commission of any act. *Id*. The Court of Appeals noted, "under no theory of the evidence in this case, could appellant have committed bother the original theft by burglarizing [the victim's] apartment *and* have received the stolen credit cards from someone else who had committed the burglary." *Id*. at 751-52 (emphasis in original).

In this case, each the trial court and the state incorrectly informed the jury an actor must have permission to enter and cannot exceed the scope of the purpose of entry, leaving the jury with a false impression of the law. Secondly, under no theory of the state's case, could Appellant be without effective consent. She was employed and went where she was told. This shows direction by an owner, not the absence of effective consent. It also shows an absence of fraud or influence in

37

order to enter a particular habitation. Indeed, Appellant was told to go into the rooms.

In sum, this is a case where the original jury charge error was not corrected nor ameliorated in another segment of the charge; rather it was compounded by an omission of an important definition, the inclusion of an incorrect statement of the law, a similar omission and inclusion in the lesser-included theft instructions in the charge, and by the statements made by the trial court and the state during voir dire that a person must not exceed the scope for which they were granted permission to enter a residence, lest they be charged with burglary. *Ngo*, 175 S.W.3d at 752. The evidence shows Appellant was directed into each room. This would meet the definition of effective consent. But for the omission from the charge and the erroneous representation of the law in the charge and by the court and state during voir dire and closing argument, a different result could have been reached by any rational jury, and very likely would have been reached, had the jury been properly instructed. Accordingly, Appellant suffered real and not theoretical harm, an erroneous and incomplete jury charge, which resulted in a fundamentally unfair trial. *See Almanza*, 686 S.W.2d 171-72; *see also Ngo*, 175 S.W.3d at 751-53; *see also Abdnor*, 871 S.W.2d 392.

**Issue III.**

**Whether it is error to exclude evidence of a lack of felony convictions when the defense witness called to offer the evidence has significant knowledge of the defendant's life history but has not known the defendant her entire life.**

**Standard of Review**

When the record reveals constitutional error, the reviewing court must reverse the judgment of punishment unless it determines, beyond a reasonable doubt, the error did not contribute to the punishment. TEX. R. APP. P. 44.2(a); *Holmes v. State*, 323 S.W.3d 163, 173-74 (Tex. Crim. App. 2010); *Roberson v. State*, 100 S.W.3d 36, 44 (Tex.App. – Waco 2002, pet ref'd).

The exclusion of evidence offered by a defendant will be constitutional error if the evidence forms such a vital part of her case that its exclusion effectively precludes the defendant from presenting a defense. *Potier v. State*, 68 S.W.3d 657 (Tex. Crim. App. 2002). When the erroneously excluded evidence does not amount to a denial of due process or other constitutional right, the standard of review is that of harmless error analysis. *Potier*, 68 S.W.3d at 666; *see also* TEX. R. APP. P. 44.2(b).

Evidentiary ruling are reviewed for abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990) (en banc). The trial court

ruling will not be disturbed if it is within the zone of reasonable disagreement. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). The ruling will be upheld is it is reasonably support by the record and correct on any theory of the law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

## Law Applicable

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness." TEX. R. EVID. 602.

A lay witness may offer testimony in the form of opinions or inferences under Texas Rule of Evidence 701 when the testimony is rationally based on the witness' perception and helpful to a clear understanding of a fact in issue. TEX. R. EVID. 701.

A defendant is eligible for community supervision from a jury if she files a sworn motion with the court, before the trial begins, verifying she has not previously been convicted of a felony in any jurisdiction, and the jury enters that finding in the verdict. TEX. CODE CRIM. PROC. art 44.12 §4(e) (West 2013).

A witness' testimony may include opinions, beliefs, or inferences so long as they are drawn on his own senses or experiences at the time of the event, and are

thus, within the witness' personal knowledge. *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002).

"When testimony reasonably support a defendant's motion for probation, the issue should be submitted to the jury." *Trevino v. State*, 577 S.W.2d 242, 242 (Tex. Crim. App. 1979).

**Analysis**

It was error to exclude Raul Munoz's testimony that Appellant never had been convicted of a felony. He knew Appellant for five years, described them an being married, and knew her and her family well. He testified they applied for apartment and had never been denied for any felony convictions for Appellant. Similarly, Appellant applied for various jobs and never had been denied employment due to a felony conviction. It was a reasonable conclusion for Mr. Munoz to form this opinion, belief, or inference because of the many experiences within his personal knowledge. *See Osbourn*, 92 S.W.3d at 535.

The state argued, however, Appellant's knowledge was based on hearsay. The trial court sustained on that basis and also ruled "there's not competent evidence on the basis that Mr. Munoz's testimony … is that he's only known the defendant five years. Mr. Crowther, the assistant district attorney, has lodged an objection that any other suggestion would be hearsay, that the witness, Mr. Munoz, is not competent to establish that the defendant has not been convicted a felony in

the years preceding his knowing her….” V RR 76-77. In doing so, the trial court relied on *Mansfield v. State*, 306 S.W.3d 773. (Tex. Crim. App. 2010).

In *Mansfield*, during the punishment phase of a trial, the defendant's father testified without objection that his son had never been convicted of a felony. The state lodged an objection to the defense question whether the defendant had ever been on felony probation. The defendant took that stand to be asked whether he had ever been on felony probation, and he was impeached with evidence of extraneous bad acts. The Court of Criminal Appeals ruled that because defendant's father testified he never was convicted of a felony without objection, the matter was in evidence, and defendant did not need to take the stand to establish eligibility. *Mansfield v. State*, 306 S.W.3d at 776.

In the case at bar, the trial court took *Mansfield* to mean that a father knows his child for the whole life and can, therefore, testify to a lack of felony convictions. As the trial court stated, “..[Mr. Munoz's] evidence is not competent as to her entire life. His evidence is competent for the last five years.” V RR 75-76. Contrary to this, in *Walker v. State*, the Texas Court of Criminal Appeals squarely stated, “We see no reason in the world why appellant's mother, his father, his aunt, or some of his associates who testified in the case in his behalf could not have been asked a direct questions by the appellant as to whether he had theretofore been convicted of a felony….” 299 S.W. 417, 418; 108 Tex. Crim. 190, 193 (Tex. Crim.

App. 1927). In any event, Mr. Munoz should have been allowed to testify to his personal knowledge. And as trial counsel argued, such evidence supports the motion for probation and from that, the jury could conclude Appellant was eligible for community supervision. V RR 75. If the state has evidence to the contrary, they are free to present it in their rebuttal case. V RR 75.

It was error to exclude evidence of an opinion by Mr. Munoz. He testified that based on all his acquired knowledge and experience of Appellant, she never had been convicted of a felony. V RR 70. This is the form of a lay opinion under Rule 701, Texas Rules of Evidence. However, the state's only objection was hearsay. Clearly, matters within a witness' personal knowledge are not hearsay. The state did not object on the basis that he had an insufficient basis to form such an opinion. The trial court, however, also excluded the evidence on lack of competency due to the witness' lack of personal knowledge, despite the witness ability to offer some evidence of the matter in issue. Ultimately, Appellant's trial counsel argued Mr. Munoz should be permitted to testify and have the issue raised, allowing it to go to the weight and not admissibility.

The Texas Code of Criminal Procedure only requires the defendant file a motion that she has never been convicted of a felony and that the jury enter the finding that the motion is true. art. 41.12 § 4(e) (West 2013). It does not suggest what the burden the defendant must satisfy to raise the issue. So long as there is

43

some reasonable evidence to support the application for probation, as any other jury instruction, it should be admitted to evidence and submitted to the jury. *See Trevino v. State*, 577 S.W.2d at 242; *see also Walker v. State*, 299 S.W. at 418. The state might then argue with their evidence whether the sworn application is true. The jury, ultimately, may find the evidence does not support a defendant's contention she never had been convicted of a felony.

Here, the evidence was erroneously excluded for an erroneous reason. Mr. Munoz had enough personal knowledge offer evidence on the matter. In doing so, he could rely on his personal knowledge and inferences thereon to form a lay opinion Appellant never had been convicted in her entire life. Moreover, the exclusion of any such evidence, based on opinion or personal knowledge should have been allowed in front of the jury. The exclusion of the proffered evidence of Mr. Munoz on the matter of whether Appellant was probation is eligible was error.

The resulting harm is one of Constitutional dimension. The exclusion prohibited the important right to eligibility for probation. In order to gain such right, Appellant was impelled to testify in order to correct the erroneously excluded evidence. V RR 77. Because this error cannot be said not to have affected the substantial rights of Appellant, beyond a reasonable doubt, and the matter should be reversed for a new trial on punishment. If only statutory error, it also affected her substantial rights and, in the end, contributed to the punishment of the jury.

**Issue IV.**

**Whether the defendant's constitutional right not to be compelled to testify is violated when evidence is erroneously excluded and the defendant is then impelled to testify to establish the same facts the excluded evidence would have shown.**

## Standard of Review

The court will review de novo whether a defendant voluntarily testified or whether she felt coerced to testify against her will. *See Minnesota v. Murphy*, 465 U.S. 420, 434-39 (1984); *Johnson v. State*, 357 S.W.3d 653, 657 (Tex. Crim. App. 2012); *Chapman v. State*, 115 S.W.3d 1, 6-11 (Tex. Crim. App. 2003).

When the record reveals constitutional error, the reviewing court must reverse the judgment of punishment unless the reviewing court determines beyond a reasonable doubt, the error did not contribute to the punishment. Tex. R. App. P. 44.2(a); *Holmes v. State*, 323 S.W.3d 163, 173-74 (Tex. Crim. App. 2010); *Roberson v. State*, 100 S.W.3d 36, 44 (Tex.App. – Waco, 2002, pet. ref'd).

## Law Applicable

No person may be compelled in a criminal case to be a witness against herself. U.S. CONST. amend. V; TX CONST. art. I §10; *see also* TEX. CODE CRIM. PROC. art. 1.05 (West 2013).

"The proposition that a criminal defendant cannot be compelled to take the

stand and give evidence against himself is so well understood that it requires no citation of authority to support it." *Brumfield v. State*, 445 S.W.2d 732, 735 (Tex. Crim. App. 1969)(on reh'g.). This right must not be interpreted in a hostile spirit and must be given liberal application and construction. *Brumfield v. State*, 445 S.W.2d at 734. The privilege against self-incrimination is "as broad as the mischief against which it seeks to guard." *Id*. (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1692 (1966)).

This important constitutional right may be waived only if done knowingly, voluntarily, and intelligently. *Id*. at 735.

The right against self-incrimination prohibits an increased sentence when the accused invokes the right to refuse to testify. *Carroll v. State*, 68 S.W.3d 250, 253 (Tex.App – Fort Worth 2002, not pet.) (op. on remand) (citing, *e,g,, United States v. Wright*, 533 F.2d 214, 216 (5th Cir. 1976)). Efforts made by the state to compel the accused to testify against her will at the sentencing "clearly would contravene the Fifth Amendment." *Estelle v. Smith*, 451 U.S. 454, 463, 101 S.Ct. 1866, 1873 (1981). The right not to be compelled is only fulfilled when the accused is guaranteed the right to remain silent unless it is her choice to speak in the "unfettered exercise of [her] own will, and to suffer no penalty … for such silence." *Id*. (quoting *Mallory v. Hogan*, 378 U.S. 1, 8 (1964)).

Though the right against being compelled to testify is subject to waiver, the

salient issue in a case where the accused testified is whether the testimony was given knowingly, voluntarily, and intelligently. *Birdsong v. State*, 82 S.W.3d 538, 544 (Tex.App. – Austin 2002, no pet.).

There are exceptions to the rule that error is waived for failing to object to the introduction of evidence. *Leday v. State*, 983 S.W.2d 713, 718-19 (Tex. Crim. App. 1998). One such exception is when a defendant's testimony is used to introduce other facts and is impelled by the state's introduction of evidence obtained in violation of the law. *Sweeten v. State*, 693 S.W.2d 454 (Tex. Crim. App. 1985); *Thomas v. State*, 572 S.W.2d 507 (Tex. Crim. App. 1976). This exception exists in the law because when the defendant's decision to testify is to overcome the impact of such evidence, the same illegality that taints the prosecution's evidence must also taint the testimony. *Sweeten*, 693 S.W.2d at 457 (citing, *e.g.*, *Harrison v. United States*, 392 U.S. 219, 223, 88 S.Ct. 2008 (1968); *Thomas v. State*, 572 S.W.2d 507, (1976)).

This exception extends to all evidence subject to the exclusionary rule, and the state bears the burden to prove its illegal action did not impel the defendant's testimony in order to remove itself from this exception. *Sweeten*, 693 S.W.2d at 458-59; *Sherlock v. State*, 632 S.W.2d 604, 606-07 (Tex. Crim. App. 1982). The following factors are relevant to determine whether the state meets its burden:

(1)      evidence trial counsel would not have called the defendant to

testify but for the overruling of the objection to the illegally obtained evidence;

(2)     even if trial counsel would have called his client to testify, evidence that his client would have testified in the same manner but for the introduction of the illegally obtained evidence;

(3)     whether the state introduced other evidence of guilt, and the strength of that evidence; and

(4)     whether there is other evidence, aside from that objected to, that would have induced the defendant to testify in the same manner.

*Sherlock*, 632 S.W.2d at 607.

Another exception is that the harmful effect of improperly admitted evidence is not cured by the fact the accused sought to meet, destroy, or explain it by introducing rebutting evidence. *Thomas*, 572 S.W.2d at 512.

A defendant is eligible for community supervision from a jury if she files a sworn motion with the court, before the trial begins, verifying she has not been previously convicted of a felony in any jurisdiction, and the jury enters that finding in the verdict. TEX. CODE CRIM. PROC. art 44.12 §4(e) (West 2013).

The prior criminal records, her general reputation, the circumstances of the offence for which she is on trial, or any other bad act or evidence of extraneous offense shown beyond a reasonable doubt attributable to the accused may be

offered by either party as the court deems it relevant to sentencing. TEX. CODE CRIM. PROC. 37.07 § 3(a)(1) (West 2013).

Neither party is obligated to offer evidence at the punishment phase of trial. *Morales v. State*, 416 S.W.2d 436 (Tex. Crim. App. 1967).

**Analysis**

Texas law has historically supported the argument that the right not to be compelled to testify is not waived when the accused must to do so to meet, challenge, or rebut erroneously admitted evidence. *See Sweeten v. State*, 693 S.W.2d 454; *see also Thomas v. State*, 572 S.W.2d at 512. In the case at bar, evidence of Appellant's eligibility for probation was erroneously excluded. As a result, Appellant was impelled to testify solely to introduce evidence she never had been convicted of a felony. *See* V RR 77. As a result, Appellant was impeached by previous convictions for misdemeanor theft, albeit already introduced during the state's punishment case-in-chief, and a previous deferred probation, and with an extraneous bad act for delivery of a controlled substance. *See* V RR 102-119.

The trial court read on the record that he felt Appellant might have been able to prove Appellant's eligibility for probation through other means, such as questioning the state's investigator about a lack of felony history, or any other peace officer or defense investigator. V RR 117-18.

The trial court kept out Mr. Munoz's evidence because it was hearsay and found he could not testify Appellant had no felony history because he did not know her his entire adult life. The state investigator went over several criminal judgments of Appellant and not one was a felony conviction. If that same witness could be used to establish a lack of felony history, then surely the jury could have concluded such. Moreover, trial counsel for Appellant suggested the lack of evidence from the investigator was already before the jury and that combined with Mr. Munoz's testimony could have lead the jury to that conclusion. *See* V RR 75. Finally, any other witness mentioned by the trial court in its recitation are not individuals who would have known Appellant her entire life. In keeping with the court's reasoning for excluding Mr. Munoz's testimony, no such witness would have been competent to testify to Appellant's lack of criminal history.

Appellant was provided a notice of intent to use extraneous offenses and supplemented the notice the day trial commenced. CR 7, 24. Accordingly, Appellant may have intended to testify in the months of preparation before trial. That may have been disturbed by the newly notice extraneous offense. Regardless of such hypotheticals, the state clearly wanted her to testify in order to introduce the extraneous offense, of which they had no other admissible evidence. CR 7-11.

Appellant suggests the same body of law used to determine whether the right not to be compelled to testify is waived in a case involving the challenge of

wrongfully introduced evidence also apply to a case where evidence is wrongfully excluded. Having established the evidence was wrongly excluded in issue III, above, Appellant now argues she did not waive her right not to testify knowingly, intentionally, or voluntarily.

Appellant unequivocally stated she did not wish to testify. V RR 63-64. After the trial court sustained a state objection to Appellant's offered witness establishing the eligibility, Appellant so much as said she elected to testify only to establish her eligibility for probation. V RR 77-78. Appellant next suggests, the state be required to show its action did not impel the Appellant to testify using the same factors listed in *Sherlock*, 632 S.W.2d at 606-07.

As applied, the *Sherlock* factors weigh as follows: (1) Trial counsel would not have called Appellant to testify but for the exclusion of Appellant's evidence. V RR 77-78. (2) This one is not applicable because Appellant made it clear she would not have testified but for the exclusion of her evidence. (3) The evidence at issue is that of an extraneous bad act for the delivery of a controlled substance. As admitted by the state, they had no other admissible evidence to support the extraneous offense. From the state perspective, her testimony was the *sine qua non* to getting in what the state said they intended to in it second notice of intent to offer extraneous offenses. CR 24. (4) There was no other evidence that would have induced Appellant to testify. All in all, the factors weigh in favor of Appellant.

In total, the evidence was wrongfully excluded, and Appellant needed to testify in order to satisfy the statutory right to the probation option. There were no other witnesses available, in the heat of trial, that would have been able to testify they had known Appellant her entire life and make the offer that she never had been convicted of a felony. As such, her Constitutional right to be free from self-incrimination was violated in order to correct to wrongfully excluded evidence. There was no other reason as to why she testified. Her right was not knowingly, voluntarily, or intelligently waived. She was impelled to testify solely by the erroneously excluded evidence. That taint had tainted her election to testify. Accordingly, her Constitutional right has been violated. Because of that, the jury heard evidence of a delivery of controlled substance offense. That admission is likely to have contributed to a punishment verdict near the top of the range. As such, the Constitutional error has caused harm. We requests this Honorable Court reverse the judgment and remand this matter for a new trial on punishment.

# PRAYER

Appellant respectfully prays as follows:

1. Appellant respectfully prays this Honorable Court find the evidence insufficient to support the verdict and by doing so, enter an acquittal.

2. In the alternative, Appellant respectfully prays this Honorable Court find there was unobjected to error in the instructions to the jury and that such error cause egregious harm and remand the case for a new trial.

3. In the alternative, Appellant respectfully prays this Honorable Court reverse and find the exclusion of evidence to establish Appellant's eligibility for community supervision was (A) Constitutional error which cannot be determined, beyond a reasonable doubt, not to have contributed to the punishment verdict or (B) error which affected Appellant's substantial rights and remand for a new trial on punishment.

4. In the alternative, Appellant respectfully prays this Honorable Court find Appellant was impelled to testify in violation of her Constitutional right against self-incrimination and said error cannot be determined no to have contributed to the verdict on punishment and remand for a new trial on punishment.

Appellant prays for any other relief to which she may be entitled in equity or

at law.

Respectfully submitted,

/s/ Gary E. Prust

Gary E. Prust
State Bar No. 24056166
1607 Nueces St.
Austin, Texas 78701
(512)469-0092
Fax (512)469-9102
gary@prustlaw.com
Attorney for Angelita Pacheco

## CERTIFICATE OF SERVICE

In compliance with TEX. R. APP. PROC. 9.5(b)(1), (d), and (e) the undersigned attorney certifies that a true and correct copy of the foregoing Brief was served at or before the time of its filing upon Mr. Gary Bunyard and on Mr. Blake Ewing, through electronic via the electronic filing manager through efile.txcourts.gov on the 27th day of July, 2015.

    /s/ Gary Prust
Gary E. Prust


## CERTIFICATE OF COMPLIANCE

I hereby certify Appellant's Brief contains 11,210 words, excluding those parts so allowed in TEX. R. APP. PROC. 9.4(i)(1) and is in compliance with TEX. R. APP. PROC. 9.4(2)(B). In so certifying, I rely upon the word count function of the computer program used in preparation of this document.

    /s/ Gary Prust
Gary E. Prust

# APPENDIX CONTENTS

**Appendix A**
   **II RR 87-93**

**Appendix B**
   **IV RR 59-60**
   **IV RR 63**
   **IV RR 70**

**Appendix C**
   **V RR 75-77**

**Appendix D**
   **V RR 102-119**
   **V RR 63-64**
   **V RR 77-78**

# Appendix A
## Issue I.

**II RR 87-93**

the owner and attempted to commit or committed theft.

THE COURT: That's correct. Not a specific item, so it is entering with the intent to --

MR. CROWTHER: That's the other theory, Judge. This is a committed theft, the intent to commit or committed theft. It's not the theory where you enter with intent to commit theft.

THE COURT: Okay. So it is -- you have plead the second theory, that you entered without the effective consent and committed.

MR. CROWTHER: Yes.

THE COURT: But he's making that distinction.

MR. CROWTHER: I didn't hear it that way. I heard him say that you had to have the intent to steal before you entered.

THE COURT: That's not true, Mr. Watson.

MR. WATSON: Right. That's what I -- but I was using their definition there and the jurors have said you don't have to have consent if you go in with the thought that you're sealing something. So I'm saying what's the proper charge if I go in and my intention --

THE COURT: That becomes -- that becomes a factual issue for them to determine --

MR. WATSON: Right.

THE COURT: -- doesn't it?

MR. WATSON: Right. And so I said assume certain facts, assume --

THE COURT: And those become commitment questions.

MR. WATSON: No. Well, it's can you follow the law. Such as DWI, assume the fact that a person was intoxicated, can you find them guilty.

THE COURT: Okay. Well, make sure you're tracking it with what the charge is.

MR. WATSON: Right. So I'm just saying assume you had effective consent because you're using the bathroom and then you steal, is it theft or it is burglary? I think that tracks the indictment and solves their objection.

THE COURT: You had someone talk about the scope of the consent. The scope of the consent. One of the jurors -- one of the prospective jurors talked about the scope of the consent and whether or not it's effective because they exceeded the scope of the consent, Mr. Watson. It's beginning to be confusing by going down that road is what it seems to the Court because it becomes a factual issue for them to determine whether the consent was effective if they exceed the scope of the consent because your hypothetical suggest you have the consent to go in and use the restroom. You don't have the consent to go in and commit theft.

MR. WATSON: Yes.

THE COURT: So that would exceed the scope. That would exceed the effective consent, wouldn't it, Mr. Watson.

MR. WATSON: But if you read the grammar it says when -- the timing of it is when you enter the household, so when does --

THE COURT: Well, that's what -- that's what the jury is going to decide in this case and whether the defendant had that intent when they entered to go do something other than, if you will, what the limited consent was for. That's the factual issue for them to determine.

MR. WATSON: That is correct, Judge. And, thus, if you assume certain facts the question is then if you assume that fact, that means the State has not met all the elements of the crime and, therefore, I'm asking them can they follow the law and find that person guilty of theft and not burglary.

THE COURT: Couch the hypothetical correctly then so you're not -- you're not putting out facts that don't really track what the law says. It's confusing the way you're asking the question to the Court and I think to the prospective jurors.

MR. WATSON: Well, I think they're answering it pretty honestly. I think they understand it.

THE COURT: I think they may be confused because they're giving all these different answers, Mr. Watson.

That's just the Court's perception.

MR. WATSON: I think they give different answers because they have different opinions and they have different common -- different experiences.

VENIREPERSON BRYANT: Can I ask a question?

MR. WATSON: Sure.

VENIREPERSON BRYANT: Let's say we're -- let's say we're on a three-day train ride and I've got a sleeper car.

MR. WATSON: Okay.

VENIREPERSON BRYANT: And my wallet is in there and someone goes in there and steals my wallet. Is that burglary of a habitation?

MR. WATSON: No. Okay. Now, let's work it -- let's work through the definition. Did they have your consent to go in that -- in your sleeping car?

VENIREPERSON BRYANT: Maybe it was the maid.

MR. WATSON: So let's just use -- let's just use a regular person.

VENIREPERSON BRYANT: Well, let's consider that's my habitation.

MR. WATSON: Okay. Yeah. That was going to be my next question. Do you consider that as your habitation because you slept there that night?

VENIREPERSON BRYANT: I suppose so.

MR. WATSON:  Okay.  I believe you're correct.

VENIREPERSON BRYANT:  I paid for the sleeper car.  It's mine.

MR. WATSON:  And I believe you're correct.  I think everybody in this courtroom would agree with you that that would be a habitation.

VENIREPERSON BRYANT:  So the facts of the case is it's habitation and a theft was occurring.

MR. WATSON:  Okay.  So the question is and what you would have to decide as a juror what was the person's -- did the person have effective consent when they entered that -- your sleeping car.

THE COURT:  Well, the question, Members of the Jury, persons can have consent to do some things.  I don't remember which juror it was that talked about you could exceed the scope of the consent.  The consent was to go use the restroom in the first hypothetical.  The consent wasn't effect as to going into the house and stealing something, so there was a limited consent given.  And depending on the facts of this case, what you find from the circumstances that you have not heard yet, that's what you're going to have to decide, whether there was a consent given to do something or whether a person is, you know, having -- had some idea they were going to commit theft, and, thus, the limited consent given to enter, if that's what the facts are, maybe wasn't effective

for that particular purpose.

MR. WATSON: But I think you're leaving out part of the indictment, Judge. You have to decide when if that -- when the person entered what was their -- what was the consent, the desire, what was going on in that. And I think the jury can infer from evidence, circumstantial evidence, direct evidence as to what that person's intent was.

THE COURT: That's what they -- that's what they will have to do, Mr. Watson. They will have to infer whether at the time -- whether at the time they entered they had the effective consent. Did they -- did they -- for example, in your illustration was it a ruse to go into the home to say I want to look for the restroom when I really intended to go in there and see if I could see some jewelry or currency that I could steal and that's what they have to decide.

MR. WATSON: Right. And I agree. And I think if it was a ruse to get into the house that's a burglary because at the time the person entered they did not have effective consent because --

THE COURT: I agree with you, Mr. Watson. The State disagree with that?

MR. CROWTHER: The way it's charged, Your Honor, is --

THE COURT: You have effective consent, though, the way you pled it.

MR. CROWTHER: Right. For entry. They have to have effective consent for the entry and what they do on the inside.

THE COURT: Okay. That's exactly what we're saying. That's exactly what we're saying. They entered and then the intent has to be something other than just the entry. At the time they're entering they have the intent to do something that exceeds the scope of the consent that was given. And that's all we're saying, Members of the Jury. That sounds like it's parsing words, but that's what you're going to have to decide when you hear the case. Splitting hairs, how many angels can dance on the head of a pen, Mr. Watson. Is that a good illustration?

MR. WATSON: I think a lot of -- a lot of angels.

THE COURT: Go head. You've got 25 minutes left.

MR. WATSON: All right.

MR. CROWTHER: You have a card up.

MR. WATSON: Yes. Yes, sir?

VENIREPERSON DIXON: So does -- for me the arguing over semantics over this kind of leads me already to guilty on the fact that there was theft or burglary, so I just wanted --

MR. WATSON: No, I just -- I'm just trying to

# Appendix B
## Issue II.

**IV RR 59-60**
**IV RR 63**
**IV RR 70**

coincide that -- even if you wanted to buy her explanation that her friend gave her the phone, Melina Escobar had never seen a phone like that in her possession before that same day, the same day the phone was reported missing, the same day that someone had reported it stolen from their room, same day she was found in possession of some of the other stolen property. So the fact that she's committed thefts is clear and you can check off that box.

But that's not all she did.  She did more than commit a theft in this case, much more.  She went into those rooms without the effective consent of the owners.  Now, the defense mentioned something earlier in the course of this trial about, well, her coworker gave her consent she put the key card in the door, right, so she had consent to go in.  That's not going to work.  You have to get effective consent of the owner, of the owner of the room.  Look at the definitions of an owner.  Someone with title to the property, possession of the property, or a greater right to be there than the defendant.  Melina Escobar, the defendant's coworker who she used to get her in those rooms, could not give consent for the owner if the owner didn't want to give it.  Okay?  So she can't point at her coworker and say, oop, I'm off the hook because my coworker let me in the room.  That's not going to work.  She had to have the effective consent of the owners.

And, now, maybe, maybe some of you will say,

well, but, you know, a housekeeper, they generally are allowed to go in there. Okay. But they are generally allowed to go into rooms why? To clean rooms. Melina Escobar -- maybe if you think they didn't give her consent to go in either, but she had their effective consent because she was going in to clean a room and that's what she did. She -- the defendant can't make up. She wasn't going in to clean rooms. She was going in to steal things. And we know she was going in to steal things. She wasn't a housekeeper who went into a room and made a really bad decision. Oh, I just saw something and I had an impulse and I grabbed it up and I shouldn't have done that. We know that's not what she was doing because she did it more than once. She did it multiple times. She a plan, a scheme, a design. She wasn't using a crowbar or a lock-picking tool to open up these rooms. She was using her uniform, a little push card, and she was using her coworker to get her in that room. Those were her burglary tools. That's how she got in. That was how she planned to get in. She worked this job for three days. Two of those days her coworker was standing right beside her and during that time she didn't take anything. As soon, as soon as she had an opportunity to be on her own in that room she began going from room to room grabbing up property that didn't belong to her. Those are the actions of a burglar. That's someone who has a plan to use a tool to get into a room without people's consent

to be able to divert your attention from that fact.  Thank you very much.

### DEFENSE CLOSING ARGUMENT

MR. WATSON:  Angelita is not guilty of a theft case here.  Is not guilty of a theft case.  We know that this should be a theft case.  She should be charged with a theft.  She had no idea what was going on when she showed up to work that day.  She doesn't pick up the list.  She doesn't pick up the keys.  She doesn't know what room they're going in.  She doesn't know what's going to happen that day.  She's following her trainer.  She is following Melina Escobar.

When you refer to consent in the definition it means assent in fact, whether express or apparent.  I think there's obvious apparent consent here.  Everybody knows when you go into a hotel room you give the housekeeping staff consent to go into your room to clean, not to steal, but to clean.  There's no question about that.  You go -- nobody gives anybody consent to steal.  I'm never going to say that.  Everybody has had something stolen from them.  Everybody.  I've had stuff stolen from me.  Okay?  Now, the consent was apparent.  He signed up, got his room key, and he could have revoked that consent at any time.  And Melina Escobar talked about how to do that.  You go up to the desk or you can put on a magnet on the front door.  If they -- if it goes up to the desk, they put it on a list.  They take it off a list.  They

this is a theft -- should be a theft case, she's still not guilty of both, theft of the I-pad and the theft of the cellphone. Thank you.

## STATE'S FURTHER CLOSING ARGUMENT

MR. CROWTHER: May it please the Court? Counsel. Now you get to hear a little bit from me. I thank you for your service. I want to address that intent to deprive or that deprive aspect of this right away. If you look at Paragraph Two of your charge, it says, "A person commits theft if she unlawfully appropriates property with intent to deprive the owner of the property", and then we go into the definition of deprive. Well, what do you think she was doing as she's secreting that I-pad underneath her mattress or between her mattress in her room. That's intent to deprive. Well, that's okay, he got it back that day. Does that mean that when you take something from Wal-Mart and you're on your way and Wal-mart catches you outside the registers, no theft because they got it back? No. You intended to deprive it. You got caught. She intended to deprive it. She got caught.

Remember on voir dire we talked about scope of consent. Yes, you can say that everybody knows a hotel is going to have maids come. They're given indirectly permission to come in and sheets, and towels, and clean up your mess, not to take your stuff.

# Appendix C
## Issue III.

**V RR 75-77**

have -- but the jury makes a decision when its --

THE COURT: Only -- only if they have some competent evidence.

(Indiscernible cross-talk)

MR. WATSON: Let me complete my thought. The evidence would be his testimony, A. Second piece of evidence would be their lack of introduction of a felony. So the jury would have sufficient evidence, based on what has been presented and what has not been presented, to come to the finding that she has not been convicted of a felony. So they get to rule based on what is in front of them and also what is not in front of them.

THE COURT: It's your burden to establish eligibility, though, not the State's to prove lack of eligibility. You have the burden. It's always been that way.

MR. WATSON: I think it's -- if you read the statute it's clear it gives you two tenets. One, she has to file the sworn affidavit, which she has done. And the second tenet is the jury has to find that she never been convicted.

THE COURT: That means -- that means they have to have some evidence.

MR. WATSON: Evidence is included from what he just testified.

THE COURT: But he can't -- his evidence is not competent as to her entire life. His evidence is competent

for the last five years.  We don't know prior to that.

MR. WATSON:  That is sufficient for the five years and if they want to get up and argue, well, all he knows is those five years, he doesn't know the rest of her life, let them argue that.  The other evidence is the lack of evidence that they've presented that she has been convicted.

THE COURT:  That may be the way to do it, Mr. Crowther.  You just get -- you can make that argument.  I'll let them -- that they haven't proven it because you can ask him the question you don't know prior to that five-year period whether she's been convicted of a felony.  We'll do it that way and that way you can argue it.  How is that?

MR. CROWTHER:  I object to that because it's hearsay, but if that's the Court's ruling I will abide.

THE COURT:  You know, I may just let you have what you want.  You remember my old -- one of my old favorite sayings, Mr. Crowther, about --

MR. CROWTHER:  I do.

THE COURT:  -- certain animals getting fat and others getting slaughtered, you know.

MR. CROWTHER:  And you know --

THE COURT:  You want to -- you want to go down that road, Mr. Crowther?

MR. CROWTHER:  Yes, Your Honor, I do.

THE COURT:  All right.  Then I'm going to

sustain the objection and I find there's no competent evidence on the basis that Mr. Munoz's testimony here outside the presence of the jury is that he's only known the defendant for five years. Mr. Crowther, the assistant district attorney, has lodged an objection that any other suggestion would be hearsay, that the witness, Mr. Munoz, is not competent to establish that the defendant has not been convicted of a felony in the years preceding his knowing her, so we're going -- we're going to remove that probation eligibility out of the -- out of the --

MS. MOORE: Well --

THE COURT: Go ahead, Ms. Moore.

MS. MOORE: We haven't closed yet.

THE COURT: Okay.

MS. MOORE: So..

THE COURT: You want to put your client on and prove up that one, Mr. Watson?

MR. WATSON: Yes, sir.

THE COURT: All right. So bring the jury in. Ms. Pacheco, you want to come over here? You can stand over here.

MR. WATSON: Just for the record, Judge, we are placing her on the stand based on that ruling. If we had the ruling in our favor we would not place her on the stand.

THE COURT: That's fine. But you feel compelled

# Appendix D
# Issue IV.

**V RR 102-119**
**V RR 63-64**
**V RR 77-78**

will stay consistent on a consistent basis with work and just, you know, with my living -- my living habits and my choices.

MR. WATSON: Pass the witness, Judge.

**CROSS EXAMINATION**

**BY MR. CROWTHER:**

Q. Ma'am --

A. Yes, sir.

Q. -- I have just a few questions for you. I guess I'll start with school.

A. Yes, sir.

Q. You went to a lot of different schools.

A. Yes, sir.

Q. Do have a four-year degree?

A. No, sir, I didn't complete a four-year degree.

Q. Do you have a paralegal certificate?

A. I have a -- it's a diploma of applied science.

Q. Okay. Now, what classes did you go to at SMU?

A. I studied psychology. I studied -- let's see. They had me studying philosophy. I never could understand that, but they had my studying philosophy. I did -- let's see. I was doing a shorthand -- shorthand dictation there also. I was taking some computer courses there. I took some -- yeah, I took economics for the accounting part. It was just a -- you know, a variety and trying to -- or I guess it was all included in the program that I had chose.

Q. How many semesters did you go to SMU?

A. Let's see. I was there for, I believe, five or six semesters.

Q. Were you on a degree plan or were you auditing courses?

A. I first started -- at first I started to audit -- the auditing the courses, yes.

Q. All right. SMU law, you never took a course in the law school, right?

A. I took the basic, the -- like, was it -- oh, my goodness. God, it's been so long. I took -- it was the intro courses to the law. We -- I got up to the contracts, when we started doing the contracts, learning how to write the contracts and stuff.

Q. Were you admitted to the law school or did you just take courses in prelaw?

A. I wasn't admitted to the law school. I took courses in prelaw, yes.

Q. Okay. Now, you worked for Jenkins and Gilchrist for one year?

A. It was part-time, just, like, weekends. It was about a year. And I'm not going to say it was a full year.

Q. Okay. And then you went to Jones Day?

A. I was working -- I was working for Jones Day during that time. I working for Jones Day also during the time I was

in school.

Q. And was this, like, on a part-time basis?

A. It was part of the program to do internship and Mr. Bond, Richard Bond, who was a litigator there, he was the one that accepted my internship and once I was no longer attending SMU he hired me on a full-time basis.

Q. And what was your position with Jones Day?

A. I was a -- I was a head -- the head legal administrative assistant.

Q. And you were an administrator? You weren't a legal professional?

A. Well, that was the term that they used for the paralegals.

Q. All right. Now, back in February of 2000 did you get arrested by the Arlington Police Department?

A. February 2000? I believe so. I believe that involved my daughter. She took something from the mall I believe.

Q. But you are the one that plead guilty to misdemeanor theft --

A. Yes, I did.

Q. -- in the County Criminal Court Number Two of Fort Worth; isn't that right?

A. That's correct, I did.

Q. All right. So you're on probation once?

A.   I was -- I don't remember if they gave me probation or if they fined me, honestly.

Q.   That's 2000?

A.   That was the Year 2000, yes.

Q.   All right.  In 2009 before you -- or I guess it's 2008 before you came down here did you get arrested by the Irving Police Department.

A.   I do not remember being arrested by the Irving Police Department.

Q.   Do you remember pleading guilty to a Class B Misdemeanor of theft and serving 30 days in the Dallas County jail?

A.   No, I don't remember.

Q.   Okay.  County Criminal Court Number One in Dallas?

A.   No.  I don't remember because I've never served more than maybe three days in Dallas.

Q.   So you did go to jail in Dallas?

A.   I've been to jail in Dallas for tickets.  Yes, I have.

Q.   Did you go to jail in Dallas for theft?

A.   No.

MR. WATSON:  Objection, Judge, asked and answered.

THE COURT:  Cross-examine.

MR. WATSON:  He's probably asked it six times.

THE COURT: No, she gives different answers, so your objection is overruled.

Q. (MR. CROWTHER) All right. Then you came down to Burnet, right?

A. No, I didn't. I moved to Cottonwood Shores.

Q. And while you were in Burnet County you took someone's credit card and used their credit card or debit card without their permission, right?

A. That's the way the charges read, yes. I didn't steal anybody's credit card, though.

Q. Did you have their credit card?

A. No. I was doing some work there to get into the Genius Book of World Records by generating a credit card number in the -- the supplemental thing that you read that you have to go through all the standardizations or whatever. For it to work you have to admit what you did or whatever and I charged that card for $13 to Dominoes Pizza. I called Dominoes Pizza and admitted to charge. They are the one that went ahead and pressed charges for that charge, yes.

Q. Well, there was a second one too involving credit card or debit card abuse?

A. There was more than one credit card at that time. There was a series of credit cards that were, I guess, being used. I was not living here, but my attorney advised me at that time to accept what was being given to me and I went

ahead and did so.

MR. CROWTHER: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (MR. CROWTHER) Now, this State's Exhibit Four, this is your probation for the credit card, right?

A. Yes, sir. Yes.

Q. And the district attorney's office at the time let you include the second case if you admitted guilt and it was included 12.45, right?

A. I believe there was -- I don't remember just being one other case they included in 12.45. I believe that it was maybe three or four cases that they told me about, yes.

Q. Okay. Now you got placed on probation for that, correct?

A. That's correct.

Q. And then you are on probation when the thefts, the hot checks happened, right?

A. Yes, for the checks.

Q. So actually one of the conditions of your probation for credit card or debit card abuse was not violating the law?

A. That's correct.

Q. And we know of at least five thefts by check, right?

A. There was -- honestly there was 11 theft by check cases. They 12.45ed them all together or whatever and the

reason that they didn't apply them to my felony probation was because I was fighting the checks because my checkbook was stolen.

Q. Well, let me --

MR. CROWTHER: May I approach the witness again, Your Honor?

Q. (MR. CROWTHER) Let me show you State's Exhibit Five.

A. Yes, sir.

Q. It has a complaint on the top and then it has a judgment underneath. Did you plead guilty to that complaint and is that judgment pertaining to you?

A. Yes, it is.

Q. Okay. Let me show you Number Six, State's Six. That complaint on top --

A. Yes.

Q. -- you've seen that before?

A. Yes, I believe so.

Q. And the judgment below that. Did you plead guilty?

A. I don't remember seeing these papers, but I did -- I know that the 571 I did plead to, but the 572 on forward they were suppose to 12.45 honestly.

Q. And what they -- what was suppose to happen is you were suppose to complete your probation in 571, right?

A. And I completed the one year that they gave me with Terry Kennedy and then they -- I went for a status hearing

because the restitution was still due because we were still fighting the fact, trying to get the checks, the copies of the checks, and everything, yes.

Q. So you were suppose to pay all the restitution in the one year --

A. Yes.

Q. -- and you didn't pay it?

A. No, sir, I did not.

Q. And they didn't send you to jail, they extended it to give you more time to pay?

A. They gave me another year probation, yes, sir.

Q. And you still didn't pay it off?

A. That's correct, I did not.

Q. And then 572 is one of the ones that was going to be 12.45ed?

A. Um-hum.

Q. But when you didn't pay all your restitution then you ended up with a judgment on this one, right?

A. I did -- again, I don't remember being -- having another check case and having another judgment for another check.

MR. CROWTHER: May I approach again, Your Honor?

Q. (MR. CROWTHER) Let me show you what I've marked as State's Exhibit 11, and Exhibit 12, and Exhibit 13 and ask you if those pertain to checks that you wrote and that were

included in 572?

A. Yes, these are. Yes, sir, they are.

MR. CROWTHER: Okay. At this time the State would move to introduce State's Exhibits 11, 12, and 13.

MR. WATSON: No objection, Judge.

THE COURT: Admitted.

MR. CROWTHER: May they be published to the jury?

Q. (MR. CROWTHER) All right. The next thing that happened was you borrowed the Watts' truck, right?

A. Well, as I said before, it was the keys were handed to my cousin. It was for my cousin to use to go back and forth to work on their property.

Q. Well, isn't it actually true that you were with your cousin and you had asked to use the truck --

A. I didn't --

Q. -- to move?

A. No, no, no. I didn't -- I was already living -- I lived on the property on Boundary already for almost a year and I never moved out of the property from Boundary.

Q. Okay. So that happened on or about the 30th day of August of 2012?

A. No, no sir.

Q. What day did it happen?

A. It was probably -- well, I didn't ask to borrow the

truck. I had my Galant. I had -- I had a vehicle. The Watts had said that since I was caring for their granddaughter and they wanted me to have a stable -- a stable vehicle basically to get her back and forth from school and wherever she wanted to go they told me that I could use the vehicle. This was all during the school year that year. And, once again, my husband and I lost another baby due to the granddaughter and we would fight a lot and we got into it kind because she was grabbing me and we went into the hospital and we lost our baby and at that time I called her grandmother and decided to terminate that agreement between them and myself. And she would come -- Mrs. Watts would bring Maddie back and forth because Maddie couldn't stay away. Maxine and Leroy told us to keep the truck there at the property and for my cousin to continue driving it because he and my husband were suppose to go to work on their property back and forth, but I no longer could be in that house. I didn't want to be there, so my husband took me out of there and we left the truck and then Maxine said take it to your mother-in-law's. When I called her she said, no, leave it there, and that's when we left the truck at my mother-in-law's home before we left to San Antonio.

Q. And that happened in the County of burnet, State of Texas?

A. Yes, sir, it did.

Q. And you had an opportunity to operate that motor

vehicle, right?

A. Yes, I did.

Q. It was owned by the Watts?

A. It was owned by Leroy, I believe, Leroy Watts, yes.

Q. And you never returned it?

A. No, I didn't return it, no, sir.

Q. Now, besides unauthorized motor vehicle you were also charged out of that transaction with the theft of the truck, right?

A. Yes, I was.

Q. Okay. And it was a Dodge pickup truck?

A. It was green Dodge pickup truck, yes, sir, it was.

Q. And it was of a value of $1,500 or more, but less than $20,000?

A. I can't honestly say to the value. I can say that it was in very good condition.

Q. And did you pick up the certified mail from the Watts notifying you to return the truck?

A. I never knew of any certified mail.

Q. And did you talk to the Watts after, say, August or September of 2012?

A. I believe I did. I think it was after that time. I was already arrested and once -- because I was indicted on the two charges and when I got out of the jail the first thing I did was call Maxine and ask her what was going on because I

didn't even understand why I was being charged and she and I spoke about the vehicle, just as we did when I saw her in the lobby. We spoke about the vehicle and hoping to find -- you know, find out what happened to it because she knew that my cousin, which we called him Gee, once again, she knew that Gee had it. And she asked me, "Hey, Angelita, you know, what happened to the truck, you know, and, you know, can you help me", and I did try to help her for a little bit. And then afterwards, I mean, you know, there was nothing else that we could do and my attorneys advised me to let them handle it from there.

Q. Okay. So this is a truck that you were there when it was borrowed and you haven't done anything to get them their truck back?

A. There was nothing other that I can do, I mean that I could do because I didn't know. I called the impounds. I called the police department. I didn't know where else to look for the truck. I mean, you know, I tried. At the same time we were looking for my car because my car was stolen too, so -- I mean during the time and we looked, like, within a day from the truck from my cousin, so we didn't find either vehicle.

Q. Now, let's go to July 21st of 2013. Did you enter Frank Alderete, Junior's room and take his cellphone?

A. I don't know if was his room. I know that I was

working at the Hill Country cleaning rooms.  I can't honestly say that I know the identity of the person that was in the room, the guest of the room.

Q.   Did you take somebody's cellphone?

A.   No, sir, I didn't.

Q.   Did you take somebody's I-pad?

A.   I didn't take the I-pad.  It was outside of the room. I don't know who the room belonged to.  I didn't know until that guest went into the office to say that he was missing an I-pad.

Q.   But you didn't turn it into the office before that guest asked, did you?

A.   I had it in my room.  By the time my husband got back from the store, within less than ten minutes I can say, the police had already gotten there and I -- they weren't there for the I-pad.  I completely lost track of the I-pad because they were asking about a cellphone.  That's why I originally went to the front office.  So whenever we were discussing the cellphone in the front office that other guest had entered and said that he was there to report his I-pad missing.

Q.   Were they also discussing a missing taser?

A.   No.  I didn't hear anything about a missing taser.

Q.   You don't remember riding in the car to Granite Shoals and the taser being shown to your coworker?

A.   No, I didn't have a taser gun or whatever she said it

was.

Q.   She just made it all?

A.   I'm not saying that she made it up.  I'm saying that I didn't drive to Granite Shoals with her and I didn't have a taser with me.

Q.   All right.  On April 14th of this year, 2014 --

A.   Yes, sir.

Q.   -- did you fail to appear in this court to answer charges consistent with a bond that was filed in the case?

A.   I don't know if I appeared late or I failed to appear honestly.  I don't know because sometimes I was late to court and I would receive a failure to appear, so I don't remember if it was a failure to appear because I didn't show up or because I was late to court that day.

Q.   But you were indicted for bail jumping, right?

A.   Yes, sir, I was.  Yes, sir.

Q.   And that also happened here in Burnet County, right?

A.   Yes, sir, it did.

MR. WATSON:  Judge.

THE COURT REPORTER:  Judge, there's a need.

UNIDENTIFIED JUROR:  I'm going to need more paper.

THE COURT:  You need to take a break?

UNIDENTIFIED JUROR:  I need more paper please.

THE COURT:  If you're taking notes you shouldn't

share them with anybody else.  Normally I don't let people take notes, not unless you have a two or three week trial with lots of exhibits, so..

MR. CROWTHER:  May I proceed, Your Honor?

THE COURT:  Go ahead.

Q.    (MR. CROWTHER) Ma'am, on July 10th of this year --

A.    Yes, sir.

Q.    -- were you on bond?

A.    Yes, sir, I was.

MR. WATSON:  Judge, may we approach?

(At bench)

MR. WATSON:  I believe you're going into the drug case; is that -- am I correct?

MR. CROWTHER:  You bet.

MR. WATSON:  We're going to ask her to plead the Fifth on that one since we're not -- she's not on trial for that charge and ask her -- instruct her not to answer questions as to that allegation because that's got a pending indictment.

MR. CROWTHER:  She's testified that since she's, you know, been here recently she's been getting better.  This drug case is two months ago.

THE COURT:  I'll let you ask about the circumstances.  You can instruct her however you want her to answer.

MS. MOORE: She's indicating that she needs to go to the bathroom.

(Open court)

THE COURT: All right. We'll take a ten-minute break. Y'all can have a break. Just wait right there. Y'all can go.

(Jury out)

THE COURT: All right. Mr. Watson, you want to instruct your client as to what you want her to do? You want to do it on the record or you want to do it off the record?

MR. WATSON: If I can speak with her.

THE COURT: You can go right up there and talk to her and tell her what you want to tell her.

And while Ms. Moore is listening Mr. Watson doesn't need to listen. The Court wants to put on the record the defense reluctantly, as they suggest, called their client to testify. We've been listening to testimony for maybe an hour possibly and the reason they were going to call the defendant was to prove up her eligibility for probation. The defense went into all sorts of other matters about her eligibility for probation, she'd be a good candidate for probation. They far exceeded what their original purpose was. And, for the record, the Court wants the record to reflect that the defense had the opportunity to ask the prosecution's witness, Mrs. Blindert, an investigator, the question whether

she was aware of the fact that the defendant had previously been convicted of a felony because she's someone who searches criminal history records, and during their cross examination they failed to do so.  There is also a peace officer in this courtroom that has dealt with this defendant.  They could have called that individual as a witness to ask that question.  The defense also has their investigator in this courtroom, one of their staff members, both of whom they could have called, in the Court's opinion, to testify and try to elicit testimony as to the fact that the defendant was never previously convicted of a felony.  They elected not to do so for whatever reason. I'm just making the record aware that there were other people that the record -- that the record will show they could have called to try to establish the defendant's eligibility for probation and they elected not to do so.

If y'all want to take your break, go ahead.  You can step down.

(Short recess taken)

(Jury in)

THE COURT:  Y'all may be seated in the courtroom.  The jury is being seated.  Go ahead, Mr. Crowther.

Q.    (MR. CROWTHER) Ma'am, on July 3rd, 2014 were you a resident of the Holiday Inn Express in Marble Falls?

A.    Yes.

Q.    On that day at approximately 3:35 p.m. did you

deliver a quantity of methamphetamine to an individual in the parking lot of that hotel?

A.   Yes, I did.

MR. CROWTHER:  Pass the witness.

MR. WATSON:  Nothing further, Judge.

THE COURT:  You can step down.

Anything else?

MR. WATSON:  At this time the defense rest.

THE COURT:  State?

MR. CROWTHER:  We close.

MR. WATSON:  Defense closes.

THE COURT:  All right.  We've taken the issues as to the charge.  I'm going to read the charge with --

MS. MOORE:  Judge --

MR. CROWTHER:  I think there's a paragraph --

THE COURT:  If you wait until I finish.  I wasn't finished before you interrupted me.

MR. CROWTHER:  I apologize.

THE COURT:  I will omit the one paragraph that needs to be deleted and get it printed and then the jury can start and you can instruct your associate over there, if you want to, to go and do what he needs to do and then by the time they get ready we'll have that done.  We're going to remove that one paragraph.

MR. CROWTHER:  We'll get it done, Your Honor.

moment please.

(Jury out)

(Short recess taken)

THE COURT: 41988, State versus Angelita Rodriguez Pacheco. We took a break at the request of the defense I guess for the purpose of deciding whether the defendant was going to testify; is that correct, Mr. Watson?

MR. WATSON: That is correct, Your Honor.

THE COURT: And the verdict is?

MR. WATSON: Well, if you can swear Ms. Pacheco.

THE COURT: Ms. Pacheco, you want to raise your right hand. Stand up please.

(Defendant sworn)

THE DEFENDANT: Yes.

THE COURT: All right. Come up this way so the court reporter can hear what you're saying and talk loud enough to her. Go ahead.

MR. WATSON: Angelita, we -- both Michelle and I spoke with you about your right to testify just now; is that correct?

THE DEFENDANT: That's correct, yes.

MR. WATSON: And we have spoken to you about it before, correct?

THE DEFENDANT: That's correct.

MR. WATSON: And we went over all the advantages

and disadvantages to testifying?

THE DEFENDANT: Yes, sir.

MR. WATSON: Okay. Do you feel --

THE COURT: Speak -- speak towards -- to her so that she can hear you.

THE DEFENDANT: I'm sorry, yes.

MR. WATSON: Do you feel like you understand all the advantages of testifying and all the disadvantages of testifying and --

THE DEFENDANT: Yes, I do.

MR. WATSON: And also as to not testifying?

THE DEFENDANT: Yes, I do.

MR. WATSON: Okay. And at this point what is your decision? Would you like to testify or not testify?

THE DEFENDANT: No, I would not like to testify.

THE COURT: So you've elected not to testify?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Thank you very much.

MR. CROWTHER: Now, it's the State's position that there is no testimony in the record with regard to never been convicted in this state or any other state of a felony before, and, thus, the charge needs to be reconstructed without --

MR. WATSON: We haven't rested then. We'll call Raul Munoz.

sustain the objection and I find there's no competent evidence on the basis that Mr. Munoz's testimony here outside the presence of the jury is that he's only known the defendant for five years. Mr. Crowther, the assistant district attorney, has lodged an objection that any other suggestion would be hearsay, that the witness, Mr. Munoz, is not competent to establish that the defendant has not been convicted of a felony in the years preceding his knowing her, so we're going -- we're going to remove that probation eligibility out of the -- out of the --

MS. MOORE: Well --

THE COURT: Go ahead, Ms. Moore.

MS. MOORE: We haven't closed yet.

THE COURT: Okay.

MS. MOORE: So..

THE COURT: You want to put your client on and prove up that one, Mr. Watson?

MR. WATSON: Yes, sir.

THE COURT: All right. So bring the jury in. Ms. Pacheco, you want to come over here? You can stand over here.

MR. WATSON: Just for the record, Judge, we are placing her on the stand based on that ruling. If we had the ruling in our favor we would not place her on the stand.

THE COURT: That's fine. But you feel compelled

to prove up -- that's the way you're going to prove up her eligibility for probation based upon my ruling?

MR. WATSON:  Yes, Your Honor.

THE COURT:  All right.  Duly noted.

(Jury in)

THE COURT:  Y'all may be seated in the courtroom.  Mr. Watson, you have another witness?

MR. WATSON:  At this time the defense calls Angelita Rodriguez Pacheco to the stand.

THE COURT:  Come up over here, please, ma'am. You want to raise your right hand?

(Witness sworn)

THE WITNESS:  I do.

THE COURT:  Have a seat, pull up close to that microphone, and state your name for the record.

THE WITNESS:  My name is Angelita Rodriguez Pacheco.

**ANGELITA RODRIGUEZ PACHECO,**

having first been duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. WATSON:**

Q.   Okay.  Do you go by another name too?

A.   I go by Munoz.  I just haven't changed my driver's license yet.

Q.   And why do you go by Munoz?